# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| SHEILA CLOONAN, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | 08-cv-700 (RCL) |
| | ) | |
| ERIC H. HOLDER, Jr., *et al.*, | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

## MEMORANDUM OPINION

## I.    INTRODUCTION

This case arises from an alleged violation of the Privacy Act, 5 U.S.C. § 522a, by an official in the United States Marshals Service ("USMS"), a component of the Department of Justice ("DOJ"). The Privacy Act governs information contained in federal agencies' records by creating guidelines for the collection, maintenance and dissemination of such records. Plaintiff Sheila Cloonan, a current USMS employee, alleges that defendant David Barnes, her former supervisor, improperly disclosed information contained in USMS records to his attorney, and then sent a letter through that attorney to several federal officials repeating the disclosed information.[1] Ms. Cloonan maintains that this letter contains information found within her protected records, and thus that Mr. Barnes—in preparing the letter—revealed personal information without her consent in violation of the Privacy Act's disclosure provisions. 5 U.S.C.

---

[1] In addition to Mr. Barnes, plaintiff named John F. Clark and Michael B. Mukasey—for whom Eric H. Holder, Jr. was substituted pursuant to Fed. R. Civ. P. 25(d)—as defendant-representatives for the USMS and the DOJ, respectively. However, as set forth below, the proper defendant under the Privacy Act is the Department of Justice, *see infra* Section IV.A, which is hereby substituted for defendants Clark and Holder, who are hereby DISMISSED. In addition, plaintiff concedes that he has withdrawn his Privacy Act claim against defendant Barnes, who is hereby DISMISSED, as his defamation claim against Mr. Barnes was previously dismissed by Judge Kennedy. *See infra* Section II.B.

§ 522a(b).  Before the Court is the motion for judgment on the pleadings or summary judgment by the USMS, the DOJ, and Mr. Barnes (collectively, "defendants").

## II.  BACKGROUND

### A.  Factual History

Plaintiff is an employee of the USMS, and through June 2007 she held a GS-13 position with the agency in Atlanta, Georgia.  Statement of Material Facts Not in Genuine Dispute ¶ 1, attached as Ex. 5 to Motion to Dismiss and for Summary Judgment, July 2, 2008 [12-5] ("Ds.' Stmt.").  The USMS, as an employer and agency subject to the Privacy Act, maintains records concerning Ms. Cloonan.  *See* Response to Plaintiff's First Set of Interrogatories Response #5 at 12, attached as Ex. 1 to Motion for Judgment on the Pleadings or, in the Alternative, for Summary Judgment, June 28, 2010 [45-1] (describing various records that contain information relating to Ms. Cloonan) ("Ds.' Inter. Resp.").  From the start of Ms. Cloonan's employment until October 2006, defendant David Barnes was the Chief of the Central Courthouse Management Group of the USMS, and was stationed in Arlington, Virginia.  Declaration of Dave Barnes ¶ 2, attached as Ex. 4 to Motion to Dismiss and for Summary Judgment, July 2, 2008 [12-4] ("Barnes 1st Decl.").  In this capacity, Mr. Barnes was plaintiff's second-level supervisor until October 2006, *id*. at ¶ 4; Ds.' Inter. Resp. #1 at 4, at which time he became the Chief of the Office of Management and Administration for the Judicial Security Division of the USMS.  Barnes 1st Decl. at ¶ 1.

For a number of years prior to this suit, Ms. Cloonan and Mr. Barnes were involved in several interagency complaints and proceedings, many of which involved allegations or testimony by plaintiff against Mr. Barnes.  *See* Complaint ¶¶ 19–24, 27, Apr. 24, 2008 [1]; *see also* Answer ¶ 19, Mar. 20, 2009 [25] (admitting "that, since 2004, Plaintiff and other U.S.

Marshals Service employees have made complaints that involve allegations of wrongdoing on the part of Mr. Barnes"); Ds.' Inter. Resp. #1 at 4 (noting several "complaints that Ms. Cloonan had previously filed against [Mr. Barnes]"). For example, between 2004 and 2006, plaintiff acted as a witness against Mr. Barnes in alleging misuse of congressionally targeted funds and brought a complaint before the Occupational Safety and Health Administration alleging that Mr. Barnes' misapplication of funds had created an unsafe work environment. Complaint at ¶¶ 20–22; *see also* Oct. 22, 2007 Letter from Paul T. Stein to Joseph M. Band *et al.* 2, attached as Ex. 1 to Complaint, Apr. 24, 2008 [1-1] (noting that plaintiff brought complaints against Mr. Barnes before, *inter alia*, his supervisors and OSHA) ("Stein Letter"). A few years later, in 2007, plaintiff filed a complaint with the U.S. Office of Special Counsel in which she "alleged that Mr. Barnes had misused funds." Answer at ¶ 23. As Ms. Cloonan's supervisor and the target of many of her actions, Mr. Barnes was aware of a number of the complaints in which plaintiff was involved, and had opinions as to their merit. Ds.' Inter. Resp. #1 at 5. According to Ms. Cloonan, the contentious disputes constituted a "lengthy history of animus" between herself and Mr. Barnes. Memorandum in Opposition to Defendants' Motion for Judgment on the Pleadings or, in the Alternative, for Summary Judgment 9, Sep. 2, 2010 [47] ("P's Opp.").

In June 2007, following the numerous incidents and disputes between plaintiff and Mr. Barnes, Ms. Cloonan received a signed Memorandum titled "Offer of a Lower Graded Position in Lieu of Reduction in Force." Memorandum re: Involuntary Demotion, attached as Ex. 1 to Motion to Dismiss and for Summary Judgment, July 2, 2008 [12-1]. The Memo informed Ms. Cloonan that she was being offered a position—at a lower grade than her current position—as a Management Analyst as the USMS Training Academy in Brunswick, Georgia. *Id.* at 1. If Ms. Cloonan declined this offer, the Memo stated that she would be "separated through [Reduction in

Force] procedures"; in other words, Ms. Cloonan would be terminated, but would be given preference if she applied for other DOJ employment in the future. *Id*. at 1–2. The Memo did not discuss any of Ms. Cloonan's earlier complaints at the USMS, nor did it suggest that the offer was in response to dissatisfaction with her performance. *See generally id*. at 1–3. Instead, the Memo stated that the proposed changes were part of "an ongoing reorganization of Judicial Security Division resources" that called for the elimination of Ms. Cloonan's prior position. *Id*. at 1; *see also* Ds.' Stmt. ¶ 3 (stating that elimination was "due to a reorganization of USMS resources"). Ms. Cloonan eventually accepted the USMS's offer. Ds.' Stmt. ¶ 3.

Though she accepted the GS-12 position following the elimination of her GS-13 position, plaintiff took steps to fight the change. Ms. Cloonan first filed a complaint with the USMS's Equal Employment Opportunity ("EEO") Office on June 29, 2007 in which she asserted that the agency's actions were discriminatory. Answer at ¶ 27. A month later, Ms. Cloonan instituted an appeal with the Merit Systems Protection Board ("MSPB") challenging the decision to eliminate her prior employment. Ds.' Stmt. ¶ 4; Declaration of Joseph Band ¶ 3, attached as Ex. 3 to Motion to Dismiss and for Summary Judgment, July 2, 2008 [12-3] ("Band Decl."). In her appeal, Ms. Cloonan identified Mr. Barnes as a witness and asserted that he was responsible for her being forced to accept a lower-grade position. Answer at ¶ 29; Ds.' Stmt. ¶ 4. Joseph Band, an Associate General Counsel in the USMS's Office of General Counsel, was assigned to represent the agency in the MSPB appeal. Band Decl. ¶¶ 1, 4. Shortly after discovery in that action, Ms. Cloonan's attorney contacted Mr. Band to request Mr. Barnes' deposition. *Id*. at ¶ 6.

After speaking with plaintiff's attorney, Mr. Band contacted Mr. Barnes and informed him of Ms. Cloonan's request. Ds.' Inter. Resp. #3 at 10; Second Declaration of Dave Barnes ¶ 2, Sep. 8, 2008 [20-1] ("Barnes 2d Decl."); Band Decl. ¶ 7. Mr. Band has subsequently stated

that, during this first call, he told Mr. Barnes that (1) Ms. Cloonan had filed an MSPB appeal challenging her demotion, (2) she identified Mr. Barnes as the agency official responsible for the challenged agency action, and (3) Ms. Cloonan's counsel wished to depose Mr. Barnes. Band Decl. ¶ 7; *see also* Barnes 1st Dec. ¶ 5 (providing identical testimony). Mr. Band then asked for any information that Mr. Barnes believed necessary in defending against Ms. Cloonan's appeal, to which Mr. Barnes replied that he had no role in the decision to either eliminate Ms. Cloonan's previous position or to offer her a lower-grade position. Band Decl. ¶ 7; Barnes 1st Decl. ¶ 6.

After he received word that Ms. Cloonan was seeking a deposition, Mr. Barnes contacted his attorney, Paul Stein. Ds.' Inter. Resp. #3 at 10. According to Mr. Barnes, he informed Mr. Stein that he had no role in the USMS's decision and he provided information relating to Ms. Cloonan that he believed was pertinent to a defense of her MSPB appeal. Barnes 2d Decl. ¶ 2. The two then collaborated to create the letter (hereinafter "Stein Letter") that led to this suit.[2] The Stein Letter purports to inform USMS officials that Mr. Barnes is represented in connection with Ms. Cloonan's MSPB appeal, and then sets forth a lengthy criticism of Ms. Cloonan's performance as an employee of the USMS and overall character. *See generally* Stein Letter at 1–4. Among the various accusations are the following:

- "Ms. Cloonan has evidently been involved in an orchestrated campaign with other staff to repeatedly file unfounded, false, allegations [*sic*] against Mr. Barnes . . . . Ms. Cloonan has not prevailed in any complaints that she has filed against Mr. Barnes in the past few years." *Id*. at 1.

---

[2] The record leaves some question as to the exact method by which Messrs. Barnes and Stein created the Stein Letter. According to defendants' interrogatory responses, Mr. Barnes created a first-draft himself and then sent the document to Mr. Stein "for review, edit and appropriate action as his counsel." Ds.' Inter. Resp. #7 at 14. Following Mr. Stein's edits, Mr. Barnes reviewed the final version before it was sent. *Id*. By contrast, Mr. Barnes' declaration states that Mr. Barnes spoke with Mr. Stein and then, "tak[ing] whatever action he deemed appropriate as my representative," Mr. Stein created the Stein Letter. Barnes 1st Decl. ¶ 10. In this version of the events, Mr. Barnes' role was merely to review the Stein Letter before it was distributed. *Id*. at ¶ 11. The process by which Messrs. Barnes and Stein produced the Stein Letter, however, is ultimately immaterial, as it is undisputed that Mr. Barnes did in fact provide Mr. Stein with information, and that Mr. Stein acted on behalf of Mr. Barnes in sending the Stein Letter. Ds.' Stmt. at ¶ 13 (stating that U.S. Attorney General has certified that Mr. Barnes' "actions in connection with the issuance of the October 22, 2007 letter were within the scope of his employment").

- "Evidently, Ms. Cloonan has been involved in filing multiple, false [*sic*] complaints for the past several years with various entities" including the USMS EEO Office, the U.S. Office of Special Counsel, the USMS Office of Internal Affairs, the DOJ Office of Inspector General, and OSHA. *Id*. at 2.

- "The overall USMS employment record for Ms. Cloonan will evidently depict an employee that has been very disruptive to government operations for years." *Id*.

- "It appears from the record that Cloonan could not even get along with staff in the Atlanta USMS office." *Id*.

- "[Ms. Cloonan] had multiple concerns and complaints filed by operational District staff in Atlanta against her for constant, documented, as they said [*sic*] "unstable fits of rage." *Id*.

- "[I]t is documented in writing that Ms. Cloonan entered an elevator in the Atlanta Federal Building and Courthouse and started talking to staff that her boss was going to jail, naming Mr. Barnes." *Id*. at 2–3.

- "Ms. Cloonan's angry outbursts and vulgar language toward supervisors was threatening and her constant threats to file complaints against managers were attempts to get her way." *Id*. at 3.

- "Ms. Cloonan evidently claims to be a Whistleblower which in all probability caused the agency not to take personnel actions against her." *Id*. at 4.

In addition to the laundry list of accusations concerning Ms. Cloonan's performance and her history of filing complaints, the Stein Letter also makes repeated references to "documented" incidents, what "the record" will show, events that "evidently" occurred or what the record will "evidently" reflect, and, at one point, specifically references "[t]he overall USMS employment record for Ms. Cloonan." *See generally id*. at 1–4. The Stein Letter was sent to Mr. Band and several others on October 22, 2007, *id*. at 1, 4 (addressing Mr. Band and cc'ing six other officials); *see also* Ds.' Stmt. at ¶ 11, and was received later that month. Band Decl. ¶ 9.

## B. Procedural History

After learning of the Stein Letter, plaintiff filed this action in early 2008. Complaint at 1. The Complaint set forth claims for breach of the Privacy Act against Mr. Barnes, the USMS and the DOJ, *id*. at ¶¶ 38–43, and for defamation against Messrs. Barnes and Stein personally. *Id*. at ¶¶ 44–59. The allegations in the Complaint detail several contentious proceedings involving Ms.

Cloonan and Mr. Barnes, including a proceeding in which Ms. Cloonan gave a statement as a witness against Mr. Barnes, discrimination claims in which Ms. Cloonan was the complainant, and, following Ms. Cloonan's involuntary demotion, a complaint with the USMS's Equal Employment Opportunity Office for discrimination, which remains pending. *Id*. at ¶¶ 20–27. According to the Complaint, following Ms. Cloonan's MSPB appeal, Mr. Barnes, through his counsel Mr. Stein, sent a "clearly malicious and defamatory" letter which "relied upon information obtained by David Barnes in his official capacity as a supervisory employee of the" USMS. *Id*. at ¶ 34. The case was initially assigned to Judge Kennedy.

Several months after the Complaint was filed, defendants moved to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6). In particular, Mr. Stein moved to dismiss on the ground that the Stein Letter was protected by the judicial proceedings privilege because it was sent in relation to Ms. Cloonan's MSPB appeal which Mr. Stein characterized as a quasi-judicial proceeding. The defendants currently before the Court moved to dismiss the defamation claim, arguing that Mr. Barnes was acting within his official capacity, and thus the true party of interest is the United States, which is immune from defamation claims. These same defendants also moved for summary judgment on the Privacy Act claim.

By Memorandum Opinion dated March 9, 2009, Judge Kennedy granted in part and denied in part that motion. *Cloonan v. Holder*, 602 F. Supp. 2d 25 (2009) ("*Cloonan I*"). With respect to Mr. Stein's motion, Judge Kennedy found he "ha[d] not demonstrated the 'proceeding' to which the Letter relates; whether Stein participated in the proceeding as counsel; and whether the Letter's recipients had an interest in or connection to the proceeding," and thus held that the judicial proceedings privilege was inapplicable. *Id*. at 30–32. Judge Kennedy then dismissed the defamation claim against Mr. Barnes after finding—following an unrebutted certification by the

Attorney General that Mr. Barnes acted within the scope of his federal employment in preparing and sending the Stein Letter—that the United States, as the true party in interest, is immune from defamation suits. *Id*. at 33–35. Finally, Judge Kennedy denied defendants' motion for summary judgment as premature, holding that "the issues presented by [Ms. Cloonan's] Privacy Act claim should be decided only after the parties have had an opportunity for discovery." *Id*. at 35.

Following over a year of discovery, Ms. Cloonan and Mr. Stein agreed to dismiss the defamation claim against him, Stipulation of Dismissal with Prejudice, Mar. 22, 2010 [41], leaving only plaintiff's Privacy Act claim in this case. Defendants then filed their Motion for Judgment on the Pleadings or, in the Alternative, for Summary Judgment, June 28, 2010 [45] ("Ds.' Mtn."). After the parties had briefed that motion, the case was transferred by consent from Judge Kennedy to Chief Judge Lamberth. Reassignment of Civil Case, Dec. 17, 2010 [52]. Having fully reviewed the record and the parties' evidence, the Court now turns to the merits of defendants' motion.

## III. LEGAL STANDARD

### A. Judgment on the Pleadings

Defendants initially move for judgment on the pleadings, which is permitted after the pleadings are closed, "but early enough not to delay trial." Fed. R. Civ. P. 12(c). The analysis of this motion is essentially equivalent to a motion to dismiss under Rule 12(b)(6) for failure to state a claim. *Lindsey v. District of Columbia*, 609 F. Supp. 2d 71, 77 (D.D.C. 2009). To succeed on a motion for judgment on the pleadings, the moving party must demonstrate "that no material fact is in dispute and that it is entitled to judgment as a matter of law." *Peters v. Nat'l R.R. Passenger Corp.*, 966 F.2d 1483, 1485 (D.C. Cir. 1992) (quotations omitted). In reviewing

the motion, the Court must accept the non-movant's allegations as true and should view the facts in the light most favorable to the non-moving party. *Lindsey*, 609 F. Supp. 2d at 76.

### B. Summary Judgment

In the event they are unsuccessful on their Rule 12(c) motion, defendants alternatively move for summary judgment. Summary judgment should be granted when the "materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations, . . . admissions, interrogatory answers, or other materials" show "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a)–(c). This standard requires more than the mere existence of *some* factual dispute between the parties; "the requirement is that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48 (1986). "A fact is 'material' if a dispute over it might affect the outcome of a suit under the governing law." *Holcomb v. Powell*, 433 F.3d 889, 895 (D.C. Cir. 2006). "An issue is 'genuine' if the evidence is such that a reasonable jury could return a verdict for the non-moving party." *Doe v. IRS*, 706 F. Supp. 2d 1, 5 (D.D.C. 2009) (citing *Anderson*, 477 U.S. at 248).

In seeking summary judgment, the moving party "bears the initial responsibility of informing the district court of the basis for its motion, and identifying those potions [of the evidence in the record] which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Once this burden has been met, the non-moving party must "go beyond the pleadings and by [her] own affidavits, or by [the evidence in the record] designate specific facts showing that there is a genuine issue for trial." *Id*. at 324 (quotations omitted). In doing so, the non-moving party's opposition "must consist of more than mere unsupported allegations or denials and must be supported by affidavits,

declarations or other competent evidence, setting forth specific facts showing that there is a genuine issue for trial." *Doe v. Dep't of the Treasury*, 706 F. Supp. 2d 1, 5 (D.D.C. 2009); *see also Freedman v. MCI Telecomm. Corp.*, 255 F.3d 840, 845 (D.C. Cir. 2001) (holding that plaintiff must have more than "a scintilla of evidence to support [her] claims"). In other words, the non-moving party is required to point to evidence that would permit a reasonable jury to find in her favor. *Laningham v. United States Navy*, 813 F.2d 1236, 1242 (D.C. Cir. 1987). At the same time, "the evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in [her] favor." *Anderson*, 477 U.S. at 255.

## IV. ANALYSIS

The Privacy Act "safeguards the public from unwarranted collection, maintenance, use and dissemination of personal information contained in agency records . . . by allowing an individual to participate in ensuring that his records are accurate and properly used." *Henke v. Dep't of Commerce*, 83 F.3d 1453, 1456 (D.C. Cir. 1996). To accomplish this goal, the Act "gives agencies detailed instructions for managing their records and provides for various sorts of civil relief to individuals aggrieved by failures on the Government's part to comply with the requirements." *Doe v. Chao*, 540 U.S. 614, 618 (2004). For example, the Act limits the circumstances under which an agency may disclose records of individuals, 5 U.S.C. § 552a(b), mandates that agencies closely account for all disclosures, *id*. at § 552a(c), and requires agencies to make reasonable efforts to ensure the accuracy and completeness of records. *Id*. at § 552a(e).

Here, plaintiff seeks "actual damages, statutory damages and all attorney fees and costs" for an alleged violation of the disclosure provisions of the Privacy Act. Complaint at ¶ 43. Specifically, plaintiff alleges that Mr. Barnes, acting in his capacity as a supervisor at the USMS, reviewed and disseminated information in violation of § 552a(b) of the Act by coordinating with

Mr. Stein to send the Stein Letter to several persons. *Id*. at 4, 38–42. In their motion, defendants seek dismissal on two independent grounds: first, defendants argue that only cabinet-level agencies are proper defendants under the Privacy Act, and that plaintiff has failed to properly name such an agency as a defendant, Ds.' Mtn at 2–4; second, defendants maintain that the available evidence creates no reasonable dispute that Mr. Band or Mr. Barnes , ever retrieved information from plaintiff's records at the USMS—a necessary element for liability. *Id*. at 4–8. For the reasons set forth below, the Court will grant in part and deny in part defendants' motion.

### A.     Proper Parties under the Privacy Act

Defendants argue that plaintiff has failed to name a proper party as a defendant, asserting that claims under the Privacy Act may only be brought against cabinet-level agencies, and that plaintiff's decision to name only individuals as defendants is therefore fatal. *Id*. at 2–3. In response, plaintiff argues that the USMS was named in the Complaint and is a proper defendant in this action, and also points out that she "did name the Department of Justice by naming the then-Attorney General as a defendant." P's Opp. at 3–4. The Privacy Act defines agency by reference to § 552 of the statute, 5 U.S.C. § 552a, which codifies the Freedom of Information Act ("FOIA") and defines agency by additional reference to section 551(1). Taken together, these provisions produce a definition "mean[ing] each authority of the Government of the United States, whether or not it is within or subject to review by another agency," *id*. at § 551(1), "includ[ing] any executive department, military department, Government corporation, Government controlled corporation, or other establishment in the executive branch of the Government." *Id*. at § 552(f)(1).

Defendants' proposed limitation—that the Act only reaches cabinet-level entities—finds no support in the statutory language. As an initial matter, though cabinet-level agencies are only

subject to review by the Executive, the definition of agency in the Privacy Act includes entities "within or subject to review *by another agency*." *Id*. at § 551(1) (emphasis added). A plain reading of the Act's language thus forecloses defendants' narrow interpretation. Moreover, defendant's reliance on § 105 of the statute—which defines "Executive agency" to mean "an Executive department, a Government corporation, and an independent establishment," *id*. at § 105—is in error, as that section in no way limits the reach of the Privacy Act to only "cabinet-level agencies." For these reasons, this Court has previously held that naming components as defendants under the Privacy Act is appropriate since the statute's plain language is clear that "an agency need not be a cabinet-level agency such as the DOJ" to be liable. *Lair v. Dep't of Treasury*, No. 03 Civ. 827 (RCL), 2005 U.S. Dist. LEXIS 4645 (D.D.C. Mar. 21, 2005) (citing *Peralta v. U.S. Attorney's Office*, 69 F. Supp. 2d 21, 26 (D.D.C. 1999)).

Though defendants are mistaken that only cabinet-level agencies may be sued under the Privacy Act, they do correctly point out that plaintiff's Complaint only names individuals—and not agencies—as defendants here. Individuals are not proper parties under the Act. *Armstrong v. Bureau of Prisons*, 976 F. Supp. 17, 23 (1997). However, dismissal of plaintiff's claim is unwarranted on the record in this case. As to the USMS, the Complaint, in its very first paragraph, alleges as follows: "This is an action for . . . violation of the Privacy Act by Sheila Cloonan . . . *against the U.S. Marshals Service*." Complaint at ¶ 1 (emphasis added). The USMS, which is "the nation's oldest and most versatile federal law enforcement agency," U.S. Marshals Service, *Fact Sheet: U.S. Marshals Service*, at 1, *available at* www.usmarshals.gov/duties/factsheets/general-1209.pdf, is undoubtedly an "authority of the Government of the United States"—and thus an agency under the Act. 5 U.S.C. § 552(1). Indeed, the USMS itself has previously represented that it is subject to the Privacy Act, *Boyd v. DOJ*, No. 04 Civ. 1100, 2005

12

U.S. Dist. LEXIS 3981, at *4 (D.D.C. Mar. 9, 2005) (describing letter in which USMS declared that "disclosure [of the requested documents] would also violate the Privacy Act"), and in this very action the agency produced at least one record which states that the document is subject to the statutory provisions of the Act. Sep. 29, 2006 Letter from Lisa M. Dickinson to George Retos 1, attached as Ex. 3 to Declaration of Kevin Byrnes, Aug. 6, 2008 [17-4]. As to the DOJ, there is no doubt that the DOJ was in substance—if not in form—named as a defendant here. On its face, the Complaint makes clear that in naming former attorney general Michael Mukasey, plaintiff was naming the Department of Justice as a defendant. *See* Complaint at ¶ 9 (noting that "the Attorney General of the U.S. Department of Justice . . . is an essential party" and that he is "a nominal party only and is named *ex officio*"). And though defendants complain that the "DOJ would be the proper defendant to a Privacy Act case, but not an individual," Ds.' Mtn. at 3, defendants themselves have previously recognized that the Attorney General "is named in this action only in his official capacity," Answer at ¶ 9; *i.e.*, only as a representative of the DOJ. *See, e.g.*, *Mulhern v. Gates*, 525 F. Supp. 2d 174, 179 (D.D.C. 2007) (considering Privacy Act claim against Secretary of Defense without expressing concern over named defendant). Thus, in light of the record, as well as defendants' abandonment of this argument in their Reply, the Court finds that plaintiff's error in naming only individual defendants was harmless.

Based on the foregoing discussion, the Court will GRANT defendants' motion for judgment as to Mr. Barnes, as this Court previously dismissed the defamation claim against him, *Cloonan I*, 602 F. Supp. 2d at 32–35, and plaintiff's remaining claim under the Privacy Act is brought against him solely in his official capacity; the Court will GRANT defendants' motion as to defendants Clark and Holder; and the Court will substitute the Department of Justice as the proper defendant in this suit.

**B.      Plaintiff's Privacy Act Claim**

"The Privacy Act safeguards the public from unwarranted collection, maintenance, use and dissemination of personal information contained in agency records." *Bartel v. FAA*, 725 F.2d 1403, 1407 (D.C. Cir. 1984). Included among the measures in the Act are strict limitations on the disclosure of agency records. *See Pilon v. DOJ*, 73 F.3d 1111, 1112 (D.C. Cir. 1996) (noting that Privacy Act "establishes conditions under which certain kinds of agency documents must be kept private and may be disclosed only to authorized individuals"). Specifically, the Privacy Act's disclosure provision prohibits federal agencies and their officials from "disclos[ing] any record which is contained in a system of records by any means of communication to any person . . . except pursuant to a written request by, or with the prior written consent of, the individual to whom the record pertains." 5 U.S.C. § 552a(b).

Plaintiff maintains that Mr. Barnes violated the Act's disclosure provision when he shared information concerning her employment history, performance evaluations, and numerous complaints she filed over the course of her time at the USMS. Though the Stein Letter did not include actual copies of USMS records, the Privacy Act goes beyond the mere dissemination of the physical records to prohibit "nonconsensual disclosure of any information that has been retrieved from a protected record." *Bartel*, 725 F.2d at 1408. Thus, the question for the Court is whether the terms of § 552a(b) were violated when Mr. Barnes shared information concerning Ms. Cloonan with his attorney Mr. Stein, and when Mr. Stein—acting on behalf of Mr. Barnes— further disseminated that information by sending the Stein Letter. To prevail on her wrongful disclosure claim, plaintiff "must show that (1) the disclosed information is a 'record' contained within a 'system of records'; (2) the agency improperly disclosed the information; (3) the disclosure was willful or intentional; and (4) the disclosure adversely affected the plaintiff." *Doe*

*v. Dep't of the Treasury*, 700 F. Supp. 2d at 6 (citing *Krieger v. DOJ*, 529 F. Supp. 2d 29, 41 (D.D.C. 2008)). Here, only the first element—whether the information was in a "record" within a "system of records"—is in dispute.

### 1.     The Retrieval Rule

The Privacy Act prohibits disclosure of "any record which is contained in a system of records by any means of communication." 5 U.S.C. § 552a(b). The statute defines "system of records" as "a group of any records under the control of any agency from which information *is retrieved* by the name of the individual or by some identifying number, symbol, or other identifying particular assigned to the individual." *Id.* at § 552a(a)(5) (emphasis added). This definition—which incorporates the requirement that information "is retrieved"—has given rise to the so-called "retrieval rule" under the Privacy Act. *See Mulhern*, 525 F. Supp. 2d at 183 ("[L]iability for nonconsensual disclosure is limited by what is often called the 'retrieval rule.'"). This rule, simply stated, is that "'the Privacy Act only covers disclosures of information which was either directly or indirectly retrieved from a system of records.'" *Doe v. Dep't of the Treasury*, 706 F. Supp. 2d at 6 (quoting *Fisher v. Nat'l Insts. Of Health*, 934 F. Supp. 464, 473 (D.D.C. 1996)); *see also Henke*, 83 F.3d at 1460 ("[A] group of records should generally not be considered a system of records unless there is *actual* retrieval of records keyed to individuals.") (emphasis added). Thus, an agency official who discloses information that he or she acquired from non-record sources—such as observation, office emails, discussions with co-workers and the "rumor mill"—does not violate the Privacy Act in doing so, even if the information disclosed is also contained in agency records. *See Krieger v. DOJ*, 529 F. Supp. 2d 29, 47 (D.D.C. 2008) ("Information derived solely from independent sources is not prohibited by the statute even though identical information may be contained in an agency system of records."); *see also Doe v.*

*Dep't of Veterans Affairs*, 519 F.3d 456, 463 (8th Cir. 2008) (noting that Act "does not prohibit disclosure of information independently acquired").  The retrieval rule thus ensures that the Privacy Act "does not create a monastic vow of silence which prohibits governmental employees from telling others what they saw and heard merely because what they saw or heard may also be the topic of a record in a protective file." *Krieger*, 529 F. Supp. 2d at 47.[3]

While the retrieval rule has a long and well-established history, the D.C. Circuit carved out an exception to the doctrine in the seminal case of *Bartel v. FAA*, 725 F.2d 1403 (D.C. Cir. 1984).  *Bartel* involved a plaintiff who had been an FAA employee when he requested what he believed to be public information concerning three FAA airmen in order to prepare an Equal Employment Opportunity complaint that he was contemplating.  *Id*. at 1405.  After filing the complaint, however, his supervisor suspected that he had collected the information in violation of the Privacy Act, and requested an investigation.  *Id*. at 1405–06.  At the conclusion of the investigation, the U.S. Attorney declined to prosecute, but the supervisor determined that a letter of reprimand was appropriate.  *Id*.  The letter was never completed, however, as the plaintiff left the FAA before the supervisor could issue the reprimand.  *Id*. at 1406.  Over a year later, the plaintiff returned seeking employment with the FAA.  *Id*.  Upon learning of the plaintiff's return, the supervisor sent letters to the three airmen stating that the FAA had investigated the plaintiff and had concluded that the plaintiff "improperly obtained records pertaining to you."  *Id*.  The supervisor also participated on a call in which another individual was informed that "the FAA had proposed disciplinary action against" the plaintiff based on the incident.  *Id*.  Upon learning of these actions, the plaintiff brought suit claiming that the supervisor violated the Privacy Act

---

[3] Courts often advance two general justifications in support of the retrieval rule.  First, there is a concern that the imposition of liability for disclosures of independently acquired information would create an "intolerable burden" on agencies and their employees.  *Doe v. Dep't of the Treasury*, 706 F. Supp. 2d at 7 (citing *Doe v. Dep't of Veterans Affairs*, 519 F.3d at 461).  Second, interpreting the law to reach information not actually retrieved from agency records would extend the Privacy Act beyond its purpose—to preclude disclosure without consent of personal information in a system of records.  *Id*. (citing *Bartel*, 725 F.2d at 1409–11).

and prevented him from obtaining employment at the FAA. *Id.* at 1406–07. The district court dismissed the case, explaining that because the plaintiff had previously violated the statute, his complaint stood the Privacy Act "on its head." *Id.* at 1407.

On appeal, the FAA argued that the supervisor's disclosure did not violate the Privacy Act because the information conveyed by messages he sent "was not physically retrieved" from any protected records, but "rather came from . . . independent knowledge of the investigation and its results." *Id.* Though the D.C. Circuit recognized the legitimacy of the retrieval rule, *see id.* at 1408 (noting unanimous agreement that Privacy Act "does not necessarily cover disclosure of information merely because the information happens to be contained in the records"), it found the rule inapplicable given the "peculiar" circumstances in the case. As the *Bartel* Court explained: "[A]n absolute policy of limiting the Act's coverage to information physically retrieved from a record would make little sense in terms of [the Act's] underlying purpose," because "an official could circumvent [the Act] with respect to a record he himself created by simply not reviewing it before reporting its content or conclusions." *Id.* at 1409; *see Doe v. Dep't of the Treasury*, 706 F. Supp. 2d at 7 (noting that *Bartel* "recognized an exception to the [rule] for cases in which an inflexible application of that rule would permit agencies to flout the purposes of the Privacy Act); *Mulhern*, 525 F. Supp. 2d at 183 n.12 (explaining that *Bartel* Court was concerned that strict interpretation of retrieval rule "would allow officials to circumvent the Act's nondisclosure provisions by simply not reviewing [a covered record] before reporting its contents or conclusions") (quotations omitted). Thus, "*in the factual context of this case*," *Bartel*, 725 F.2d at 1409 (emphasis in original), the D.C. Circuit held that the retrieval rule is inapplicable where an agency official discloses "information in a record that he may not have read but that he had a primary role in creating and using, where it was because of that record-

related role that he acquired the information in the first place." *Id*. at 1411. Here, plaintiff relies

on *Bartel* in arguing that the Privacy Act "clearly did not intend to create so great a loophole as

would allow every government supervisor to disclose information learned about their underlings

in the course of employment." P's Opp. at 7 (citing *Bartel*, 725 F.2d at 1408–09).

In response, defendants suggest that in the recent case of *Armstrong v. Geithner*, 608 F.3d

854 (D.C. Cir. 2010), the D.C. Circuit "narrowed [the] earlier holding in *Bartel*." Ds.' Mtn. at 2.

*Armstrong* involved a plaintiff whose attempt to obtain employment at the USDA was sabotaged

after six USDA employees received anonymous letters disclosing that the plaintiff was the

subject of an on-going investigation at the Treasury Inspector General for Tax Administration's

office, where he had been employed. 608 F.3d at 856. Without knowing who wrote the letters,

the plaintiff sued his former office, alleging that information about the investigation in the letters

was drawn from his records at the agency, and thus the disclosures were in violation of the

Privacy Act. *Id*. at 857. Immediately prior to trial, it was disclosed that the letters had been

written by the plaintiff's co-worker at his old office. *Id*. At trial, however, the co-worker denied

"getting the information in the letters from any of the . . . supervisors involved in the

investigation or from records of the investigation," and insisted that she "based the letters upon

independent sources—the rumor mill, her original complaint, and her own observations,

assumptions and speculations." *Id*. Based on this testimony, the district court dismissed the

plaintiff's claims. *Id*. The D.C. Circuit affirmed the dismissal after reviewing the relevant

information in the letter and pinpointing independent sources for all of it. *Id*. at 858–59. The

*Armstrong* Court then turned to the exception, explaining that the *Bartel* Court "narrowly

tethered the exception . . . to the facts of that case, in which the disclosing agency employee had

'ordered the investigation which resulted in the [report], made a putative determination of

wrongdoing based on the investigation, and disclosed that putative determination in letters purporting to report an official agency determination." *Id*. at 859–60 (citing *Bartel*, 725 F.2d at 1411). The D.C. Circuit thus held that the exception was inapplicable because the co-worker "neither acquired the information . . . in any way related to a record, as an investigator might have done, nor used the record in her work for the agency." *Id*. at 860.

Though the *Armstrong* Court emphasized the narrowness of the *Bartel* exception, the Court is unconvinced that this holding alters the scope of that exception to any degree. Simply put, the *Bartel* exception has always been understood to apply narrowly. Indeed, the D.C. Circuit itself previously explained that *Bartel* "found the Act applicable when an official disclosed his personal recollection of an investigation that he had instituted, despite the fact that he may not have reviewed the actual investigatory record before doing so." *Pilon*, 73 F.3d at 1118. And two years prior to *Armstrong*, district courts already recognized that the *Bartel* exception is "limited . . . to the 'peculiar set of circumstances present [in that case]: disclosure by an agency official of his official determination made on the basis of an investigation which generated a protected personnel record.'" *Krieger*, 529 F. Supp. 2d at 48 (quoting *Bartel*, 725 F.2d at 1409); *see Longtin v. DOJ*, No. 06 Civ. 1302, 2006 U.S. Dist. LEXIS 52470, at *11 (D.D.C. Aug. 3, 2006) (explaining that *Bartel* exception only applies where disclosing official "had a primary role in creating and using [the record].") (quotations omitted). The Court thus rejects any suggestion that *Armstrong* somehow *further* narrowed the *Bartel* exception, and instead holds that the case merely confirmed what district courts have always understood: Under *Bartel*, "the retrieval rule will not protect an agency from liability under the Privacy Act when an official discloses his personal recollection of an investigation that he had instituted, despite the fact that he may not have reviewed the actual investigatory record before doing so," *Doe v. Dep't*

*of the Treasury*, 706 F. Supp. 2d at 8 (quotations omitted), but this exception "is a narrow one that should be applied only in cases turning on similar facts and raising similar concerns."  *Id.*

Though *Armstrong* merely confirmed the scope of the *Bartel* exception, defendants also argue that the exception, as understood prior to *Armstrong*, remains inapplicable here.  Ds. Mtn. at 5–8.  The Court agrees.  There is no evidence upon which the Court can conclude that *any* information contained in either Mr. Barnes communications to Mr. Stein or the Stein Letter itself was learned by Mr. Barnes during the course of any investigation that he ordered, undertook or oversaw.  Indeed, at her deposition Ms. Cloonan stated that she was unaware of whether Mr. Barnes played any record-related role with respect to files related to her at the USMS. Deposition of Sheila Cloonan 30:10–20, attached as Ex. 2 to Motion for Judgment on the Pleadings or, in the Alternative, for Summary Judgment, June 28, 2010 [45-2] ("Q: Now, did Mr. Barnes ever have responsibility for maintaining or creating official personnel file records on you? . . . A. I'm not aware of how he maintained anything in headquarters since I was in a field office. . . . Q: So you don't know whether he had any role in maintaining or preparing or safeguarding your official personnel folder? A: Right.") ("Cloonan Dep.").  In the case of *Doe v. Dep't of the Treasury*, the district court was confronted with a plaintiff whose co-worker was quoted by a newspaper article revealing the plaintiff's name, sexual orientation, and information concerning an internal investigation linked to the plaintiff.  706 F. Supp. 2d at 3–4.  The Court rejected plaintiff's attempt to apply the *Bartel* exception, distinguishing the case before it from *Bartel* on the grounds that, "unlike the supervisor in *Bartel*, [the co-worker here] did not institute the investigation of [the plaintiff] . . . nor did he have a primary role in creating and using [the plaintiff]'s Privacy Act-protected records. . . . [And] there is no evidence that any information [the co-worker] disclosed was acquired from a record-related role."  *Id.* at 9 (quotations and

citations omitted).  Here, the Court sees no basis upon which to distinguish this case from *Doe v. Dep't of Treasury*, as plaintiff has produced no evidence that Mr. Barnes obtained information contained in her USMS records in any investigative or record-keeping role.  *See Krieger*, 529 F. Supp. 2d at 48 (holding that *Bartel* exception applies only where "a supervisor dislcos[es] the results of an investigation that he or she was responsible for implementing or overseeing—not simply [where] an employee having knowledge of information that is coincidentally contained in a subordinates' personnel file or similar records" discloses such information).

### 2.    The Dispute Concerning Retrieval

The Court's determination that the *Bartel* exception is inapplicable does not, however, end its inquiry.  The exception to the retrieval rule is merely a legal mechanism that obviates the need for factual evidence of retrieval.  In the absence of *Bartel*, however, plaintiffs still may pursue Privacy Act claims by satisfying the factual requirement of actual retrieval.  Whether the retrieval rule has been satisfied is an issue of material fact because the inquiry as to whether an agency official *actually* retrieved a plaintiff's records is dispositive.  Thus, the only question here is whether there is sufficient evidence in the record to present a genuine issue of fact as to whether Mr. Barnes retrieved protected records in preparing the Stein Letter.

Plaintiff relies primarily on the Stein Letter in maintaining that Mr. Barnes did retrieve her records, and makes three arguments concerning inferences that a reasonable juror could draw from that document.  First, plaintiff states that certain information contained in the Stein Letter could only have been produced following a review of plaintiff's files.  Second, plaintiff argues that the language of the Stein Letter itself—most notably the references to plaintiff's employee record, "documentation" of certain events, and "the record" more generally—would permit a reasonable juror to conclude that Mr. Barnes must have reviewed protected records prior to

coordinating with Mr. Stein.  Finally, plaintiff argues that because Mr. Stein is an attorney, an inference that he would have reviewed plaintiff's agency records before signing his name to a document making several representations of fact is reasonable.  *See generally* P's Opp. at 5–10.

Defendants articulate three arguments in response.  First, they emphasize that plaintiff has no evidence to corroborate her belief that Mr. Barnes relied upon USMS documents in preparing the Stein Letter.  *See generally* Cloonan Dep. at 19:7–22:6.  Defendants note, for instance, that plaintiff is unaware of what documents are in her USMS files, *id*. at 20:1–7, and thus cannot point the Court to any information in the Stein Letter that was retrieved from her protected file.  Ds. Mtn. at 6–7.  Indeed, at her deposition Ms. Cloonan conceded that she has no evidence concerning how Mr. Barnes became aware of the information in the Stein Letter.  *See* Cloonan Dep. at 27:2–6 ("Q: And you don't have any knowledge about whether or not Mr. Barnes had to go to your official personnel folder in order to get information that he put in a draft of the October 22, 2007 letter; do you? A: I'm not aware how he obtained the information.").  Nor did Ms. Cloonan have any conversations with Messrs. Barnes or Stein in which they indicated that they had reviewed her USMS files, *id*. at 21:21–25; or with anyone at the USMS who suggested otherwise.  *Id*. at 22:1–6.

Second, defendants present evidence that the information in the Stein Letter was not in fact retrieved from any agency records.  As an initial matter, Mr. Band denies sharing agency records or otherwise-protected information with Mr. Barnes during their initial conversation concerning the MSPB appeal.  Band Decl. ¶ 8.  He also denies having any involvement in drafting the Stein Letter.  *Id*. ¶ 9.  For his part, Mr. Barnes denies having ever received any documents from Mr. Band, and states that Mr. Band never told him anything beyond a basic summary of plaintiff's MSPB appeal.  Barnes 1st Decl. ¶ 7.  Mr. Barnes also avers that nothing

he discussed with Mr. Stein was drawn from agency records.  *Id.* ¶ 9.  Moreover, Mr. Barnes states that he "never received or reviewed a copy of any EEO Report of Investigation ("ROI") pertaining to Ms. Sheila Cloonan," and that—to the extent any information in the Stein Letter may be reflected in the ROI—he "obtained such information through informal communications with individuals who had interacted with Ms. Cloonan and had shared their personal experiences with [him.]"  Barnes 2d Decl. ¶ 1.  Mr. Barnes testimony is corroborated by the declaration of an EEO officer at the USMS, who states—to the best of her knowledge—that the USMS office did not provide Mr. Barnes with copies of the ROI from earlier EEO complaints.  Declaration of Joann W. Grady, Sep. 8, 2008 [20-3].

Mr. Barnes also attempts to explain where he derived the information in the Stein Letter, stating that he informed Mr. Stein of "complaints of employment-related misconduct that Ms. Cloonan had previously filed against [him]" and "information [he] had learned about Ms. Cloonan from [his] own prior experiences with her and from colleagues who had interacted with her and had shared their experiences."  Barnes 1st Decl. ¶ 8.  Thus, coupled with the fact that Ms. Cloonan lacks any independent knowledge of how the Stein Letter was prepared, Cloonan Dep. at 26:21–27:1, defendants argue that there is no genuine dispute as to whether Mr. Barnes actually reviewed Ms. Cloonan's USMS records.  Ds.' Mtn. at 5–8.

Finally, defendants suggest that plaintiff infers too much from the Stein Letter, and that no reasonable jury could conclude from the document that Mr. Barnes did in fact review Ms. Cloonan's USMS files.  For example, while plaintiff points to the use of the term "disruptive" in the Stein Letter as language copied from her protected records, at her deposition she could not confirm whether that term actually appeared in those files.  Cloonan Dep. at 28:9–29:2.  And she was equally unaware whether other terms included in the Stein Letter were derived from her

USMS records.  *See id.* at 29:3–21 (similar testimony as to Stein Letter's descriptions of fighting, threatening, dangerous horseplay, disrespectful, abusive, criminal, dishonest, disgraceful, one who made false statements, or engaged in travel voucher fraud).  Defendants thus argue that the text of the Stein Letter, standing alone, cannot overcome the sworn statements of Messrs. Barnes and Band.  Reply to Plaintiff's Opposition to Defendants' Motion to Dismiss and For Summary Judgment 5–8, Sep. 24, 2010 [48] ("Ds.' Reply").

The Court begins its analysis by rejecting defendants' final contention.  On its face, the language of the Stein Letter would permit a reasonable juror to conclude that someone involved in its preparation—here, either Mr. Barnes or Mr. Stein—actually reviewed plaintiff's USMS files.  The Stein Letter is replete with references to "the record" and "documentation" from which a reasonable juror could conclude that the preparer of the document did in fact review, and is referring to, agency records.  Indeed, at one point the Stein Letter explicitly references Ms. Cloonan's USMS personnel file.  Moreover, the specificity of the incidents catalogued in the document—including the precise identification of every entity involved in each complaint initiated by Ms. Cloonan—undercuts any contention that the full list was derived entirely from memory.  In addition, the Stein Letter at several points purports to convey information concerning investigations and describe incidents that have been documented.  *See, e.g.*, Stein Letter at 2 ("Ms. Cloonan and her representative may have misrepresented facts regarding Mr. Barnes with the MSPB"); *id.* at 2–3 ("[I]t is documented in writing that Ms. Cloonan entered an elevator . . . and started talking to staff that her boss was going to jail.").  These representations of fact must have come from somewhere, and the document itself goes to great pains to imply that the source of this information is "the record."  It is thus reasonable that a reader of the Stein Letter, viewing the document in its entirety, could conclude that the information it conveys was

derived from protected USMS files.  *See Doe v. Dep't of the Treasury*, 706 F. Supp. 2d at 10

("[T]he timing and *substance* of the disclosure at issue [can] provide circumstantial evidence of

retrieval.") (emphasis added).  Having found that a reasonable juror could conclude from the

Stein Letter that Mr. Barnes did in fact review plaintiff's USMS records, the question before the

Court is whether the sworn denials of Messrs. Barnes and Band, along with Mr. Barnes'

purported alternative sources for information in the Stein Letter, are so overwhelming that no

reasonable jury could find for the plaintiff.  The Court holds that they are not.

Defendants submit various declarations to counter inferences that one might draw from

the Stein Letter.  As an initial matter, the Court is put in a precarious position in reviewing this

evidence because the act of weighing relevant evidence to determine whether a particular fact is

more likely than not is a task for the jury at trial, not a court on summary judgment.  *See

Anderson*, 477 U.S. at 249 ("[A]t the summary judgment stage the judge's function is not himself

to weigh the evidence and determine the truth of the matter but to determine whether there is a

genuine issue for trial."); *see also supra* Section III.B.  Here, the Court's role is limited to an

evaluation of the record in its entirety to determine whether a reasonable juror could find for

either side of a disputed fact.  The Court must therefore remain mindful that summary judgment

is appropriate only if it determines that only one conclusion is reasonable based on the record.

An instructive case in the context of the Privacy Act is that of *Doe v. Henderson*, in

which a USPS worker tendered a Family and Medical Leave Act ("FMLA") request to his

supervisor disclosing his HIV-positive status, and "sometime after he provided the completed

FMLA request form, [the worker] learned that his co-workers had become aware of his HIV-

status.  2001 U.S. Dist. LEXIS 25175 at *8.  In that case, the district court held that the plaintiff

"must provide evidence that gives rise to a reasonable inference that USPS supervisors became

aware of plaintiff's condition through his FMLA form and then disclosed this information to others." *Id*. at *49. In attempting to meet this burden, the plaintiff alleged that one of his supervisors had access to the form, and that another supervisor would have reviewed the form in considering his FMLA request. *Id*. at *49–53. The district court refused plaintiff's proposed inferences, noting that plaintiff "merely theorizes that [a supervisor] . . . obtained and reviewed the FMLA request form which made him aware of plaintiff's condition" and emphasizing that "the record is utterly devoid of evidence that the FMLA form was ever retrieved for consideration of plaintiff's request." *Id*. at *53–55. On appeal, the D.C. Circuit reversed, observing that there was sufficient evidence in the record to permit a reasonable jury to conclude for the plaintiff. *Doe v. USPS*, 317 F.3d 339, 342 (D.C. Cir. 2003). Judge Tatel, writing for the Court of Appeals, emphasized two points in particular: first, the plaintiff's co-workers indicated "that the disclosures occurred *after* [the plaintiff] submitted his FMLA form," *id*. (emphasis in original); and second, evidence indicated that the supervisor in question would have reviewed the form in the normal course of business, and, in any event, the supervisor "had other ways of obtaining the information, such as retrieving" the file directly. *Id*. at 343. Based on this evidence, the D.C. Circuit held that the plaintiff "produced enough evidence of disclosure to survive summary judgment." *Id*. at 342. The D.C. Circuit closed by emphasizing that "because plaintiffs can rarely produce *direct* evidence that the government has disclosed confidential information obtained from their private records, requiring such evidence would eviscerate the protections of the Privacy Act." *Id*. at 343 (emphasis added).

Here, the Court remains unconvinced that defendants have carried their burden to demonstrate that no genuine dispute exists as to whether Mr. Barnes retrieved plaintiff's USMS records. As set forth above, the Stein Letter is strong evidence that Messrs. Barnes or Stein

reviewed agency files, and though this evidence is circumstantial, the Court must give full

weight to the reasonable inferences that may be drawn from it. *See id.* at 343 (reversing

summary judgment even though plaintiff's "evidence of retrieval is purely circumstantial"

because "we generally draw no distinction between the probative value of direct and

circumstantial evidence"); *see also Lucas v. Duncan*, 574 F.3d 772, 777 (D.C. Cir. 2009)

("'Inferences—which are commonly described as 'circumstantial evidence'—are as capable of

providing evidentiary support as 'facts'—which are commonly described as 'direct evidence.'").

In light of these reasonable inferences, Mr. Barnes' statement that he did not review such records

cannot nullify the factual dispute in its entirety. As an initial matter, the statements of defendants

are largely uncorroborated and self-serving—and while the Court has no basis to discredit their

representations, it also has no basis to conclude that these representations are fully credible and

sufficient to override contrary written representations. *See Mastro v. Potomac Elec. Power Co.*,

447 F.3d 843, 850 (D.C. Cir. 2006) (holding that on summary judgment courts must "view the

evidence in the light most favorable to the non-moving party and draw all reasonable inferences

in its favor"). Moreover, Mr. Barnes' purported reliance on memory stands in stark contrast to

his inability to recall any of the complaints that are systematically listed in the Stein Letter. *See*

Deposition of Dave Barnes 112:14–21, Feb. 16, 2011 [53-1] ("Q: Okay. What other complaints

do you recall providing responses to that involved Ms. Cloonan other than her MSPB case? A: I

think there were some EEO's, and a grievance, and things like that. Q: Okay. And so these

were— A: And I don't remember them with any specificity.") ("Barnes Dep."); *see also id.* at

122:11–17 ("Q: Well, I thought you earlier said that the only complaint you were aware of when

this letter was written was the complaint she had before the [MSPB]. A: I don't know. I just told

you I don't know the time frames. I don't know when—I don't know—"); *id.* at 159:8–10 ("Q:

But you said complaints filed. What complaints were filed? A: I don't recall.").  And Mr. Barnes' blanket denial is further undercut by his subsequent admission—omitted from defendants' other representations—that he did in fact provide some documents to Mr. Stein.  *Id.* at 56:9–59:2.  In short, whether Mr. Barnes' denial should carry the day notwithstanding representations in the Stein Letter, and whether the references and language of that document were meaningless choices in diction, as defendants intimate, Ds.' Reply at 3–4, are ultimately matters of credibility that cannot be resolved here.  *See Czekalski v. Peters*, 475 F.3d 360, 363 (D.C. Cir. 2007) (holding that courts considering summary judgment must "eschew making credibility determinations or weighing the evidence").

In addition, Mr. Barnes' reliance on alternative sources for the information in the Stein Letter are either insufficiently vague or uncorroborated.  The Stein Letter itself makes numerous representations of facts, many of which are found within the USMS's records concerning Ms. Cloonan.  Defendants, however, fail to specify any alternative sources, other than a vague statement by Mr. Barnes that he drew upon his "own prior experiences" and colleagues who "shared their experiences" in preparing the Stein Letter.  Barnes 1st Decl. ¶ 8; *see also* Barnes Dep. at 159:11–19 ("Q: For constant documented as they said—as they said unstable fits of rage. What documents? A: It doesn't say documents. It says documented. Q: Okay. What document are you referring to? A: I'm not referring to a document. It says documented.").  And the insufficiency of the very few instances in which defendants provide details further undermines reliance of Mr. Barnes' general explanations.  For example, Mr. Barnes attaches an email sent from Norm Hylton, an Assistant Chief Deputy in Atlanta, to Mr. Barnes in which Mr. Hylton complains of  "a typical disturbance that [Ms. Cloonan] is known for causing," and expresses

frustration with "the continued badgering from one employee." *Id.*[4] Mr. Hylton also notes that

he has recently wasted time "answering a frivolous complaint" filed by Ms. Cloonan. *Id.*

Nothing in this email, however, provides support for representations in the Stein Letter that Ms.

Cloonan "had multiple concerns and complaints *filed* by operational District staff in Atlanta

against her," nor that "[m]ultiple managers will *evidently* confirm her disruptions," Stein Letter

at 2 (emphasis added), as Mr. Barnes claims. Moreover, though Mr. Barnes specifically

identifies persons from whom he obtained information, Barnes 1st Decl. ¶ 8 n.1, defendants

make no attempt to provide any evidence corroborating these assertions.[5] *See supra* Section

III.B (noting that defendants must identify portions *of the record* demonstrating absence of

genuine disputes). A review of this rare instance in which defendants provide *any* specificity as

to alternative sources of information thus demonstrates that the evidence in the record is

insufficient to satisfy their burden.[6] In sum, because it must eschew credibility determinations

and permit all inferences in plaintiff's favor, and mindful of the D.C. Circuit's guidance that

requiring plaintiffs to produce "direct evidence" of wrongful disclosure would "eviscerate the

---

[4] To the extent that Mr. Barnes may have relied on emails from co-workers in collecting information for the Stein Letter, the Court does find that such reliance is not in violation of the Privacy Act. *See Krieger*, 529 F. Supp. 2d at 42–43 (explaining that courts "have routinely rejected [the] specious claim" that person-to-person emails not specifically created for purposes of creating records constitute "records" under Privacy Act).

[5] Ms. Cloonan also points to an a report in which all of the individuals Mr. Barnes claims to have relied upon also provided affidavits and sworn statements to the investigative body, Declaration of Kevin Byrnes ¶¶ 4–7, Sep. 6, 2008 [17-1], thus raising an inference that Mr. Barnes did not learn of the assertions made in the Stein Letter from co-workers, but rather by reading the report—an inference made even stronger by the lack of testimony by any of those individuals stating that they provided such information to Mr. Barnes informally.

[6] There is another exception where defendants provide specific sources for representations made in the Stein Letter. It concerns the Stein Letter's declaration that "it is documented in writing that Ms. Cloonan entered an elevator in the Atlanta Federal Building and Courthouse and started talking to staff that her boss was going to jail, naming Mr. Barnes." Stein Letter at 2–3. Defendants point to a June 27, 2006 email from Mr. Hylton in which he writes of the incident in question as he was told by another employee. Barnes 1st Decl. Ex. A. While that email does provide some details, defendants' ignore Mr. Barnes' response to Mr. Hylton's email, in which he asks Mr. Hylton to have the employee write him a fuller email documenting the incident. *Id.* Combined with the fact that the Stein Letter states that the event was "documented in writing," a reasonable jury may conclude that there was an official report on the incident was documented and filed, and that Mr. Barnes may have relied on such a report. Making such a request for documentation, however, would likely subject this specific information to the *Bartel* exception. *See Balbinot v. United States*, 872 F. Supp. 546, 550 (C.D. Ill. 1994) ("Under *Bartel* . . . it is possible for a court to find a Privacy Act violation even if the individual disseminating the information did not retrieve the information from a record contained in a system of records.")

protections of the Privacy Act," *Doe v. USPS*, 371 F.3d at 343, the Court concludes that self-serving and uncorroborated declarations cannot compel summary judgment where they are contradicted by a verified document from which a reasonable juror could conclude that the defendants reviewed agency records. *See Pilon*, 73 F.3d at 1118 ("[I]n interpreting the terms of the Privacy Act *specifically*, we have in the past taken particular care not to undermine the Act's fundamental goals.") (emphasis in original).

The lack of specificity in defendants' factual submissions also undermines their reliance on *Armstrong* in urging dismissal. In that case, the district court was aided by a full trial at which relevant witnesses—including the discloser—testified. 608 F.3d at 857. The district court was thus able to review the testimony to determine whether alternative sources existed for all the information contained in the disclosures, and subsequently found that the disclosing witness "identified a reasonable source for each bit of information" and that "no evidence that [the disclosing person] accessed relevant protected records or that anyone who did have access disclosed information to her from those records" existed. *Id*. at 859 (quotations omitted). Moreover, on appeal the D.C. Circuit was also able to review all of the key testimony to pinpoint specific sources that the disclosing official had relied upon. *Id*. at 858. And perhaps most importantly, the disclosure in that case did not, on its face, imply that its author had otherwise accessed any records. *Amrstrong* thus does not alter the Court's analysis here.

In sum, by producing a document—the Stein Letter—that is not "merely colorable" evidence but is "significantly probative" of defendants' actions, *Doe v. Dep't of the Treasury*, 706 F. Supp. 2d at 5 (quoting *Anderson*, 477 U.S. at 249–50), plaintiff has provided sufficient evidence upon which a reasonable factfinder could conclude that either Messrs. Barnes or Stein improperly reviewed USMS records. To be clear, the Court does not conclude that the Stein

Letter irrefutably establishes that agency records were reviewed, but holds only that a reasonable juror could find that Messrs. Barnes or Stein relied on such records in preparing the Stein Letter. Ultimately, whether the language in the Stein Letter is evidence that an improper review of Ms. Cloonan's files at the USMS occurred, or is simply a reference to Mr. Barnes' own personal memory and knowledge of events, or is merely a use of various terms of art, is a question of fact for a jury. And whether the denials and explanations of Messrs. Barnes and Stein should be credited notwithstanding such language is also a question for a jury. On a motion for summary judgment, the Court's task is not to weigh the relative merits of the arguments derived from the evidence, but rather to determine whether a reasonable fact-finder could reach conclusions that support either side of the dispute. Here, the court concludes that the evidence for both sides is sufficient to create a genuine issue of material fact—whether Messrs. Barnes and Stein improperly retrieved USMS records in preparing the Stein Letter.[7]

## V.    CONCLUSION

Based on the foregoing discussion, the Court holds that (1) plaintiff will be deemed to have properly named the DOJ as defendant to this action; (2) Mr. Barnes should be dismissed in his individual capacity; (3) the *Bartel* exception to the retrieval rule is inapplicable on the record before the Court; (4) there is sufficient evidence upon which a factfinder could conclude that Mr. Barnes did in fact retrieve protected agency records in preparing the Stein Letter; and (5) plaintiff's motion for surreply lacks proper basis and, in any event, is moot.

A separate Order and Judgment consistent with these findings shall issue this date.

Signed by Royce C. Lamberth, Chief Judge, on March 8, 2011.

---

[7] Plaintiff also moves for leave to file a surreply. The Court will deny this motion as moot, since none of the issues highlighted by plaintiff in her proposed surreply had any adverse effect on the outcome of this opinion. And even if that were not the case, all of the issues plaintiff points to as necessitating a surreply are either inappropriate for summary judgment (such as the weight to give Mr. Band's declaration), or were raised prior to plaintiff's opposition to summary judgment (such as the dispute over whether the *Bartel* exception should apply here.) *Lewis v. Rumsfeld*, 154 F. Supp. 2d 56, 61 (D.D.C. 2001).